1

2

3

4

5              UNITED STATES DISTRICT COURT

6             EASTERN DISTRICT OF WASHINGTON

7  WILLIAM MICHAEL DARRAH,         )
   an individual                   )        NO.    CV-11-3012-WFN
8                                   )
                    Plaintiff,      )
9                                   )        ORDER ON DEFENDANT'S
      -vs-                          )        MOTION FOR SUMMARY
10                                  )        JUDGMENT
   KENNETH L. SALAZAR, Secretary of )
11 the U.S. Department of Interior, in his )
   official capacity,               )
12                                  )
                    Defendant.      )
13

14      Before the Court is Defendant's Motion for Summary Judgment (ECF No. 18), to

15 which Plaintiff has responded (ECF No. 22) and Defendant has replied (ECF No. 23).  In the

16 Motion, Defendant moves for summary judgment on Plaintiff's claims of (1) a violation of

17 the Age Discrimination In Employment Act (ADEA) and (2) a hostile work environment.

18                              **FACTS**

19      Plaintiff, William Darrah, has been employed by the U.S. Department of Interior,

20 Bureau of Reclamation since 1997, as a dam tender with the Yakima Field Office.  In

21 approximately the same year, Duane Dobbs was also hired as a dam tender (ECF No. 20-11

22 at 1).  Though the men share the same job title and have similar responsibilities, they

23 work in different geographical parts of the Columbia Cascades Area, overseeing a number

24 of dams and waterways.  Part of a dam tender's job duties include driving a government

25 vehicle.  Although Mr. Darrah's duty station is technically in Yakima, Washington, for

26 the vast majority of Mr. Darrah's time as a dam tender, he has been allowed to leave his

ORDER ON DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT - 1

1  government vehicle at the Naches Ranger Station in Naches, Washington (ECF No. 20-8 at

2  124).  Each morning, he would drive his private vehicle a few miles to the Ranger Station

3  where he would pick up his required government vehicle and drive to the Tieton

4  Dam.

5      In addition to driving, Mr. Darrah is responsible for the operation and light

6  maintenance of a number of dams, including the Tieton Dam.  This includes opening and

7  closing gates to regulate the flow of water through the dams.  The actual determination of

8  whether more or less water is needed is made by the River Operations Group.  Mr. Darrah

9  is also responsible for taking data measurements of water flow and water volume that the

10  River Operations Group compile and review in order to make water flow determinations.

11      When Mr. Darrah became a dam tender in 1997, he was part of the Water Storage

12  Department and his direct supervisor was Tony Hargroves (ECF No. 20-2 at 18).  In 2002,

13  it was determined that the dam tenders would report to the Hydrology Department, rather

14  than the Water Storage Department.  Accordingly,  Mr. Darrah's supervisor became Kate

15  Puckett (ECF No. 20-2 at 16).  By 2005, it appears that Mr. Darrah's direct supervisor in

16  the Hydrology Department was Charles Garner, River Operations and Lands Resources

17  Supervisor (ECF No. 22-3 at 1).  In October of 2009, the dam tenders went back to the

18  Water Storage Department and Mr. Hargroves was again Mr. Darrah's supervisor (ECF

19  No. 20-2 at 16).

20      In the summer of 2009, and while still working for the Hydrology Department,

21  Mr. Darrah injured his back and needed assistance performing some of his work

22  responsibilities, particularly taking measurements of water flow.  Mr. Darrah communicated

23  this to Mr. Quentin Kreuter, who works for River Operations.  Mr. Darrah's direct supervisor,

24  Mr. Garner,  was often away  from work during August to December of 2009, taking care of

25  his wife who was fighting breast cancer (ECF No. 20-5 at 109).  Mr Garner was not informed

26  of Darrah's back problem.

ORDER ON DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT - 2

1    At a River Operations Group meeting, Mr. Kreuter asked Doug Call and Joe
2    Gutierrez, who are both hydro technicians, to assist with the some river measurements
3    because of Mr. Darrah's back (ECF No. 22-10 at 2).  Specifically, Mr. Call understood that
4    Darrah would need assistance with measuring water flow where weights of 50 or more
5    pounds were required.  Apparently, in order to take measurements of high-flow, high-volume
6    areas, larger weights are required.  Consequently, Mr. Call and Mr. Gutierrez ended up
7    doing many of the river measurements until February, 2010 (ECF No. 22-10 at 2).  At times
8    when Mr. Dobbs, the uninjured dam tender, was unable to make river measurements, he
9    would also ask River Operations to cover for him and either Doug Call, Scott Klein or Tom
10   Merendino would do the measurements instead (ECF No. 22 at 6).  Despite the fact that Mr.
11   Hargroves became Mr. Darrah's supervisor again in October of 2009, Darrah continued to
12   report his river measurements to the River Operations Group and not to Mr. Hargroves.

13   Things came to a head in early 2010.  Joe Gutierrez asked Mr. Hargroves why Darrah
14   was not completing his river measurements.   Mr. Hargroves had assumed that Mr. Darrah
15   had been completing them (ECF No. 20-3 at 2).  In fact, Mr. Hargroves noted in Darrah's
16   2009 performance review that he was doing a good job with his measurements.  After
17   speaking with Gutierrez, Hargroves went to Mr. Garner, Darrah's former direct supervisor.
18   It is clear that both Hargroves and Garner were unaware of Mr. Darrah's back injury
19   and his request for help.  Additionally, like Hargroves, Mr. Garner also thought that the
20   measurements had been completed by Darrah.[1]

21   When Hargroves came to Garner, Garner recommended that Hargroves review
22   their records, relevant charts and Q-notes, to determine what work Mr. Darrah had

23   _____

24       [1]It was Garner's usual practice to review a whiteboard in river operations to insure that
25   river measurements were being done, and the board did not list who was doing them (ECF
26   No. 22-3 at 3).  Garner never had any problems with Mr. Darrah while he supervised him.

ORDER ON DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT - 3

done.[2]  Mr. Garner had employees compile the relevant charts and Q-notes for Mr. Hargroves' review.

Hargroves learned that both dam tenders were not always completing their measurements.  Accordingly, he started requiring monthly work orders sometime in 2010 that he personally oversaw to insure that measurements were being taken (ECF No. 20-3 at 2). However, Hargroves was particularly concerned with Darrah's missing measurements. Apparently, Hargroves was also concerned that Darrah was not starting and stopping work at the appropriate time.  He had been given feedback that Darrah's vehicle had been seen at "different places," but apparently Hargroves and Darrah had previously discussed this.

On February 17, 2010, after reviewing the charts and Q-notes he had been given by Garner, Hargroves met with Mr. Darrah and told him that because the River Operations Group had alleged that he hadn't been doing his river measurements since September 2009, Hargroves was moving Darrah's assembly point from Naches Ranger Station to the Yakima Office (ECF No. 20-2 at 37; 20-3 at 91).  Hargroves contended that this would allow him to better supervise and communicate with Darrah and insure that Darrah's measurements were being completed.

Mr. Darrah was upset because the change in his assembly point would require him to drive his personal vehicle through Naches and into Yakima, pick up his government vehicle and return to Naches before heading to Tieton Dam.  This forced Darrah to drive his personal vehicle an additional 23.1 miles each way per day to pick up and drop off his government vehicle.

---

[2]A Q-note is a form that a dam tender or hydro tech fills out when gathering river data, which is then used by the River Operations Group.  Each Q-note writes a place where the drafter of the Q-note includes a personal identification number (ECF No. 20-3 at 2).

ORDER ON DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT - 4

Another meeting occurred on February 18, 2010.  In addition to Hargroves and Darrah, the meeting was attended by Mr. Garner and Walt Larrick, the Yakima Field Office Managner, who is Hargroves' supervisor.  At that meeting, the supervisors confirmed that Darrah's assembly point would be changed to the Yakima office.

On February 19, 2010, Hargroves called Darrah throughout the day, asking where he was and what he was doing (Darrah states that previously he and Hargroves usually only spoke at an early morning check-in call).  The next work day, Darrah took a family emergency leave day and did not return to work until February 25, 2010.  During his leave, Mr. Darrah repeatedly emailed the Columbia-Cascades Area Manager, Bill Gray, hoping that Hargroves decision could be overruled.  When Mr. Darrah returned on February 25, 2010, he claims to have filed an Equal Employment Opportunity [EEO] complaint against Hargroves (ECF No. 20-2 at 39), though it appears that it was not filed until April 20, 2010 (ECF No. 20-2 at 34; ECF No. 1 at 2).

In the EEO complaint, Darrah claims that Hargroves discriminated against him because of his age.  Specifically, he contends that Hargroves switched Darrah's duty station in an effort to force him to retire; that he wrongly criticized his performance for work that was performed before Hargroves was Darrah's supervisor; that Dobbs was not subject to the same treatment; and that Hargroves had previously stated that he wanted to replace Mr. Darrah's dam tender position with a craftsman position.[3]

---

[3]It is important to note that the alleged facts in Mr. Darrah's complaint and the agreed upon facts in this summary judgment motion differ in one significant way:  Mr. Darrah originally claimed that his duty station was Tieton Dam, as listed on the vacancy announcement for his job in 1997 (ECF No. 20-2 at 33).  Darrah highlighted that the job description stated that the employee must live no more than 30 driving miles from the "duty station."  However, the vacancy announcement did not explicitly define "duty station."  It did

ORDER ON DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT - 5

1    A year passes and Mr. Hargroves finds that Darrah's communication has improved
2  and that he is completing his measurements in a timely fashion.  Consequently, on
3  February 24, 2011, Hargroves moves Darrah's assembly point back to the Naches
4  Ranger Station effective February 28, 2011.

5    The Department of Interior Final Agency Decision on Darrah's EEO complaint was
6  issued November 15, 2010.  Mr. Darrah was advised that he had 90 days from the date he
7  received the decision to file a civil action.  Mr. Darrah filed this lawsuit on February 4, 2011,
8  within the 90 day time frame.

9                              **APPLICABLE LAW**

10 **I.    Age Discrimination Claim.**

11   Summary judgment is appropriate "if the pleadings, depositions, answers to
12 interrogatories, and admissions on file, together with the affidavits, if any, show  that there
13 is no genuine issue as to any material fact and that the moving party is entitled to a judgment
14 as a matter of law." Fed. R. Civ. P. 56(c).  In determining  whether there are genuine issues
15 of material fact, the court must view the evidence in the light most favorable to the
16 non-moving party. *Johnson v. Lucent Techs., Inc.*, 653 F.3d 1000, 1005 (9th Cir. 2011).

17   Summary judgment is inappropriate where sufficient evidence supports the claimed
18 factual dispute or where different ultimate inferences may reasonably be drawn from the
19 undisputed facts. *Miller v. Glenn Miller Productions, Inc.*, 454 F.3d 975, 988 (9th Cir.

20 _____

21 define a "duty location" of Tieton Dam.  Mr. Darrah appears to have initially assumed that
22 "duty station" and "duty location" were synonymous and Darrah used this as an argument
23 against having his duty station moved to the Yakima office.  The Government has offered
24 evidence that Darrah's duty station has technically always been the Yakima Office and that
25 only Darrah's assembly point has been changed (ECF No. 20-8 at 125).  In his response, Mr.
26 Darrah does not challenge the fact that his duty station is in Yakima, Washington.

ORDER ON DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT - 6

2006). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *See Celotex*, 477 U.S. at 323. The moving party must demonstrate to the Court that there is an absence of evidence to support the non-moving party's case. *See Celotex Corp.*, 477 U.S. at 325. The burden then shifts to the non-moving party to "set out 'specific facts showing a genuine issue for trial.'" *Celotex Corp.*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)). The evidence supporting summary judgment must be admissible. Fed. R. Civ. P. 56(e). Furthermore, the court will not presume missing facts, and non-specific facts in affidavits are not sufficient to support or undermine a claim. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888-89 (1990).

Under the Age Discrimination in Employment Act, "[a]ll personnel actions affecting employees or applicants for employment who are at least 40 years of age . . . shall be made free from any discrimination based on age." 29 U.S.C. § 633a(a).

> In order to establish a prima facie case of discrimination, a plaintiff must show that "(1) he is a member of a protected class; (2) he was qualified for his position; (3) he experienced an adverse employment action; and (4) similarly situated individuals outside his protected class were treated more favorably, or other circumstances surrounding the adverse employment action give rise to an inference of discrimination.

*Whitman v. Mineta,* 541 F.3d 929, 932 (9th Cir. 2008). If a plaintiff establishes a prima facie case then a court applies the burden shifting *McDonnell Douglas* framework to the claim. *See Diaz v. Eagle Produce Ltd. P'ship*, 521 F.3d 1201, 1207 (9th Cir.2008) (holding that the McDonnell Douglas framework applies to ADEA claims).

> Under this framework, the employee must first establish a prima facie case of age discrimination. If the employee has justified a presumption of discrimination, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for its adverse employment action. If the employer satisfies its burden, the employee must then prove that the reason advanced by the employer constitutes mere pretext for unlawful discrimination. As a general matter, the plaintiff in an employment discrimination action need produce very little evidence in order to overcome an employer's motion for summary judgment.

*Diaz v. Eagle Produce Ltd. Partnership,* 521 F.3d 1201 (9th Cir. 2008) (quotation marks and internal citations omitted).

**DISCUSSION**

**A. Adverse Employment Action.**

Defendant does not challenge Mr. Darrah's first two prima facie prongs, (1) that he is within a protective class since he is over 40 years of age[4] or (2) that he is qualified for his position. Rather, Defendant begins by attacking the third prima facie prong: contending that there was no adverse employment action. Defendant addresses the claims in Mr. Darrah's EEO complaint and argues that each one is insufficient to constitute an adverse employment action.

**1. <u>Change in Assembly Point.</u>** First, Defendant argues that the change in Darrah's assembly point was not an adverse employment action. Defendant relies on *Nidds v. Schindler Elevator Corp.,* 113 F.3d 912, 919 (9th Cir. 1996). In that case, the plaintiff, an elevator service mechanic, had filed a complaint against his employer and had given notice of his intent to sue the company for age discrimination. The plaintiff was asked by a supervisor whether he had dropped the complaint, to which he replied that he had not. A month later, plaintiff's supervisor removed plaintiff from his service route and transferred him to the company's restoration department. Despite the fact that the plaintiff characterized the transfer as a demotion, the Ninth Circuit declined to view the transfer as an adverse employment action. *Id.* at 915-919.

In a footnote, the *Nidds* Court also noted two other relevant cases where transfers were not found to be adverse employment actions:

> *See Steiner v. Showboat Operating Co.*, 25 F.3d 1459, 1465 n. 6 (9th Cir.1994) (questioning whether transfer from swing shift to day shift was "adverse" employment action where employee "was not demoted, or put in a worse job, or given any additional responsibilities"), cert. denied, 513 U.S. 1082, 115 S.

---

[4]Mr. Darrah was 57 years of age in February of 2010.

ORDER ON DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT - 8

1  Ct. 733, 130 L. Ed. 2d 636 (1995); *Yates v. Avco Corp*., 819 F.2d 630, 638 (6th
2  Cir.1987) (no adverse employment action where temporary transfer did not
   result in loss of salary or benefits)

3  *Id.* at 919.

4        Plaintiff responds that disrupting a work schedule arguably can be an adverse

5  action.  Plaintiff relies on *Chuang v. University of California Davis, Bd. of Trustees,* 225

6  F.3d 1115 (9th Cir. 2000).  In *Chuang*, a husband and wife team of university scientists were

7  forced by their employer to move five times.  Once, their lab was forcibly relocated by their

8  university.  The move,

9       disrupted important, ongoing research projects. Due to the delay, experimental
        subjects were lost and research grants were withheld. The [plaintiffs] lost
10      other grants entirely. Both scientists rel[ied[ on grants for their salary. During
        the move, fragile, expensive equipment was damaged and misplaced. The
11      [plaintiffs] were moved to a location with qualities— e.g., split-level
        assignment, reduced space, lack of cold storage—totally inadequate for their
12      ongoing research.

13  *Id.* at 1125.  The *Chuang* court concluded that, "[t]he removal of or substantial interference

14  with work facilities important to the performance of the job constitutes a material change in

15  the terms and conditions of a person's employment" and constitutes an adverse employment

16  action.  *Id.* at 1126.

17       However, as the Defendant points out in its reply, *Chuang* is factually distinct

18  from this case.  In *Chuang*, plaintiffs were funded solely by research dollars.  The moves

19  resulted in lost funding, lost compensation and lost work product.  In the current case, Darrah

20  continued to make the same salary and any loss in work product was a loss to the Defendant,

21  rather than to Darrah.

22       Though the Court notes that the Ninth Circuit has yet to articulate a rule

23  defining the limits of an adverse employment action, it does define an adverse employ-

24  ment action broadly.  *Ray v. Henderson*, 217 F.3d 1234, 1240 (9th Cir. 2000).  Nevertheless,

25  there are limits to what constitutes an adverse employment action. Transfer of job duties

26  with undeserved performance ratings can constitute an adverse employment action. *Yartzoff*

ORDER ON DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT - 9

*v. Thomas,* 809 F.2d 1371, 1376 (9th Cir.1987). An unfavorable job reference can be an adverse action when it is a "personal action motivated by retaliatory animus." *Id.* (internal citation omitted).  Even a "transfer to another job of the same pay and status may constitute an adverse employment action." *Id.*  However, the Court concludes that Mr. Darrah's change in assembly point, requiring him to drive an additional 23.1 miles each way, without giving him poor performance ratings, transferring him to another job or changing his pay, is not in itself enough to rise to the level of an adverse employment action.

> **2.  Fuel Cost For Driving to Work.**  Defendant next argues that an increase in fuel cost for driving to Yakima is not an adverse action.  In his response, Mr. Darrah simply states that Mr. Dobbs, the other dam tender, was not required to commute to the Yakima Field Office daily and Darrah's increase in fuel cost is a part of his potential damages (ECF No. 22 at 11).  However, Darrah fails to support his position that an increase in personal fuel costs could surmount to an adverse employment action.

> **3.  Mr. Hargroves' Efforts to Check on Mr. Darrah.**  Defendant additionally argues that Mr. Hargroves' checking up on Mr. Darrah was not an adverse employment action, but rather the appropriate action of a supervisor.  In his response, Mr. Darrah does not challenge Defendant's contention.

> **4.  Loss of Overtime.**  Defendant also addresses Mr. Darrah's claim that his loss of potential overtime amounts to an adverse employment action.  Defendant begins by contending that a loss of overtime is not an adverse employment action.  Furthermore, Defendant argues that even if loss of overtime could be an adverse employment action, Mr. Darrah's claim would fail because he worked the most overtime of any employee who reported to Tony Hargroves (ECF No. 20-9 at 130).  In support of its point, Defendant notes that Darrah worked 259.5 hours of overtime in 2010.  Duane Dobbs, by comparison, only worked 154.5 hours of overtime.  *Id.*

ORDER ON DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT - 10

1   Defendant also argues that the Court cannot consider this overtime claim

2   because it was not raised in Mr. Darrah's original EEO complaint.  Defendant cites to

3   *Whitman v. Minet*, 541 F.3d 929, 932 (9th Cir. 2008), for the position that when an employee

4   files an EEO complaint and goes through the administrative process, he must notify the

5   EEO counselor within forth-five days of the alleged discriminatory conduct.  In this case,

6   Defendant contends that since Mr. Darrah did not allege a loss of overtime claim within this

7   time period, he has failed to exhaust this claim.  More significantly, Defendant also argues

8   that because Mr. Darrah's alleged loss of overtime claim was raised in a subsequent EEO

9   complaint that has not yet ended in a final agency decision, it would be inappropriate for this

10  Court to consider the issue.

11  In his response, Mr. Darrah acknowledges that this claim was not part of

12  his original EEO complaint.  However, Darrah cites to *Green v. Los Angeles Cnty Super-*

13  *intendent of Sch.,* 883 F.2d 1472 (9th Cir. 1989), for the position that this Court may consider

14  new claims not alleged in the EEO complaint if they are like or reasonably related to the

15  allegations contained in the complaint.

16  The Court agrees with Darrah's statement of the law.  Incidents of discrim-

17  ination not included in an EEO charge may not be considered by a federal court unless the

18  new claims are like or reasonably related to the allegations contained in the EEO charge.

19  *Sosa v. Hiraoka,* 920 F.2d 1451, 1455 (9th Cir. 1990).  In making this determination, a court

20  inquires whether the original EEO investigation would have encompassed the additional

21  charges.  *Id.*  However, this Court need not reach the question of whether or not it may find

22  an adverse employment action on a claim that has not ended in a final agency decision,

23  because Mr. Darrah's loss of overtime claim, as alleged, fails on the merits.

24  The Ninth Circuit has found an adverse employment action where a plaintiff

25  was (1) repeatedly denied overtime opportunities and timely compensation in violation of

26  collective bargaining agreement while others were not *and* was (2) disciplined for an accident

ORDER ON DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT - 11

1   while others who caused similar accidents were not. *Fonseca v. Sysco Food Services of*
2   *Arizona*, Inc., 374 F.3d 840, 847 (9th Cir. 2004).   Additionally, the Ninth Circuit has
3   found that the imposition of additional overtime coupled with physical and verbal abuse
4   constituted an adverse employment action. *Kang v. U. Lim America, Inc.*, 296 F.3d 810, 818
5   (9th Cir. 2002).

6         Mr. Darrah's loss of overtime allegations do not meet this bar.   Darrah's
7   overtime work hours in 2010 totaled 259.5 hours.  This was slightly down from 2009, where
8   his overtime for the year totaled  279 hours.  However, it was substantially higher than his
9   total in 2008, when he logged a mere 19 hours.  As Defendant points out, when Mr. Darrah
10   worked 259.5 hours of overtime in 2010, Duane Dobbs only worked 154.5 hours.   Mr.
11   Darrah alleges that he lost 57 hours of potential overtime in 2010, but he still was given more
12   overtime hours than any other employee by 59 hours.[5]  Taking Darrah's allegations as true,
13   his loss of overtime fails to amount to an adverse employment action.

14         Even considering Mr. Darrah's alleged examples of adverse employment
15   actions together, the Court concludes that he has failed to show that he experienced an
16   adverse employment action.  Accordingly, Mr. Darrah fails to show a prima facie case of age
17   discrimination, and consequently his claim of age discrimination fails.

18                          **APPLICABLE LAW**
19   **II.    Hostile Work Environment Claim.**
20         The Court begins by noting that the Ninth Circuit has not addressed the issue of
21   whether there is a hostile work environment cause of action under ADEA.  The Fifth and

22   _____

23         [5]Mr. Darrah claims that 57 hours of work was done by other employees, where
24   traditionally he would have been allowed to do the work (ECF No. 22 at 12).  However, the
25   interrogatory that Darrah cites to only shows  that other employees worked 52 hours (ECF
26   No. 22-7 at 2).

Sixth Circuits have found such a cause of action. *Crawford v. Medina General Hosp*., 96 F.3d 830, 834-35 (6th Cir.1996); *Dediol v. Best Chevrolet, Inc.*, 655 F.3d 435, 440 (5th Cir. 2011). The Court will assume, *arguendo,* that ADEA contemplates a hostile work environment claim.

To establish a triable issue of fact on an age based hostile work environment claim, a plaintiff must show (1) he was subjected to verbal or physical conduct because of his age; (2) the conduct was not welcomed; and (3) the conduct was sufficiently severe or pervasive to alter the conditions of his employment and create an abusive working environment. *See Surrell v. California Water Serv. Co.*, 518 F.3d 1097, 1108 (9th Cir.2008); *Gregory v. Widnall*, 153 F.3d 1071, 1074 (9th Cir.1998); *Crawford v. Medina*, 96 F.3d 830, 835-36 (6th Cir.1996).

> The working environment must both subjectively and objectively be perceived as abusive. Whether the workplace is objectively hostile must be determined from the perspective of a reasonable person with the same fundamental characteristics. Hostility must be measured based on the totality of the circumstances.

*Fuller v. City of Oakland, Cal*., 47 F.3d 1522, 1527 (9th Cir. 1995).

In a Title VII hostile work environment case, the Ninth Circuit found that a plaintiff had been accused of failing to perform an aspect of her job, failing to pay attention in her job, causing the company to lose money, and working too slowly. *Surrell v. California Water Service Co.*, 518 F.3d 1097, 1109 (9th Cir. 2008). These accusations were made in the  presence of customers or fellow employees.  The plaintiff asserted that these accusations were based on paperwork that did not belong to her.  The Ninth Circuit found that the plaintiff's claim failed because she was unable to meet the first prong of the test, by failing to present any evidence that the comments were based on plaintiff's protected class. *Id.* Furthermore, the Ninth Circuit found that after considering the frequency of the alleged discriminatory comments, their severity, and whether it unreasonably interfered with the plaintiff's work performance, the comments were

ORDER ON DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT - 13

1   not "sufficiently severe or pervasive" to sustain a hostile work environment claim.  *Id.*
2   at 1110.

3                                     **DISCUSSION**

4          In arguing that Mr. Darrah's claim of  a hostile work environment should fail on
5   summary judgment, Defendant contends there is no direct evidence that Hargroves
6   discriminated against Mr. Darrah because of his age.  In his deposition, Mr. Darrah
7   acknowledged that Hargroves never said that he was going to push Darrah out of his job,
8   or that he needed someone younger in Darrah's position (ECF No. 20-2 at 22-25).  Further,
9   in an interrogatory, Mr. Darrah acknowledged that to his knowledge Mr. Hargroves
10  never specified Darrah's age in his comments to Darrah or others about Darrah's job (ECF
11  No. 20-7 at 119).

12         In his response, Mr. Darrah cites to his own interrogatory answer where he alleges that
13  Mr. Hargroves (1) reportedly told other employees that Darrah's dam tender duties would
14  be performed by craftsmen from the Storage crew,[6] (2) that in response to being informed
15  about Darrah's back issues Hargroves repeatedly threatened that if Darrah could not do his
16  measurement work, Hargroves would get someone else to do it, and (3) even though Darrah
17  provided Hargroves with a doctor's note, Hargroves continued to ask for doctor's notes
18  repeatedly and in a harassing manner (ECF No. 22-8 at 62).

19

20

21
    _____

22         [6]Though Mr. Darrah asserts that Hargroves was known for stating that he wanted to
23  replace Mr. Darrah, Darrah also acknowledges that he talked to Hargroves about foreseeable
24  retirement in the fall of 2009 (ECF No. 20-2 at 21), and that Hargroves spoke with Dobbs
25  about "if and when [Darrah] left, that the job would become a craftsmen position" (ECF No.
26  20-6 at 114).

ORDER ON DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT - 14

1    Also in his response, Mr. Darrah claims that he repeatedly asked for a boom or a
2   come-along to help with lifting because of his bad back, and that Hargroves did not
3   provide one until 2011 (ECF No. 22 at 13).  In support of this point, Mr. Darrah cites to
4   his own deposition.  However, the deposition paints a somewhat different picture.  In his
5   deposition, Mr. Darrah states that he told Hargroves that he needed a come-along or
6   boom; that Darrah and Hargroves were trying to figure out what tools were at their
7   disposal; that Hargroves told Darrah that if Darrah needed help taking measurements,
8   Hargroves would send someone with Darrah to do them; and that Darrah had too much
9   pride to let someone help him and instead used his truck's winch to assist his lifting of
10  the weights until he got the boom (ECF No. 22-2 at 22).  In short, Darrah's cited deposition
11  cuts against Darrah's argument that Hargroves was an unsupportive in providing a
12  boom.

13      Also in his response to the Motion For Summary Judgment, Mr. Darrah claims that
14  Hargroves sought to discredit Darrah's reputation among his coworkers.  Specifically, he
15  claims that Hargroves told Mr. Dobbs that Mr. Darrah was in trouble because he had not
16  completed his river measurements (ECF No. 22 at 13).  In support of this statement, Darrah
17  cites to the deposition of Mr. Dobbs.  However, once again the deposition is not as strong as
18  the initial claim.  In the deposition, Mr. Dobbs states that he did not remember who had first
19  told him about concerns over Darrah's river measurements; that Hargroves had a conversation
20  with Dobbs about the issue a full six months after Dobbs had first heard about it; and that
21  Hargroves said that the River Operations Group had reported that Darrah had not done
22  measurements since the summer (ECF No. 22-4 at 6).

23      Similarly and finally, Mr. Darrah argues that Hargroves discussed Darrah's EEO
24  complaint with Dobbs and that this was further evidence of a hostile work environment
25  (ECF No. 22 at 13).  However, looking at the record,  Hargroves merely mentioned to Dobbs
26  that Darrah had dropped one of his EEO complaints (ECF No. 35).

ORDER ON DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT - 15

1   After reviewing the circumstances and frequency of the alleged discriminatory

2   conduct, its severity and its potential for interfering with Mr. Darrah's work, the Court

3   concludes that Mr. Darrah's hostile work environment claim fails because he has produced

4   no evidence that Hargroves' actions and words were based on Darrah's age.  Furthermore,

5   even if Mr. Darrah could meet the first prong, Mr. Hargroves' conduct was neither severe

6   nor pervasive enough to alter the conditions of Mr. Darrah's employment.  *See Manatt*

7   *v. Bank of America, NA,* 339 F.3d 792, 799 (9th Cir. 2003) (containing a good summary

8   of what constitutes and does not constitute "severe and pervasive"):

> *See Vasquez v. County of Los Angeles*, 307 F.3d 884, 893 (9th Cir. 2002) (finding no hostile environment discrimination where the employee was told that he had "a typical Hispanic macho attitude," that he should work in the field because "Hispanics do good in the field" and where he was yelled at in front of others); *Kortan v. Cal. Youth Auth.*, 217 F.3d 1104, 1111 (9th Cir. 2000) (finding no hostile work environment where the supervisor referred to females as "castrating bitches," "Madonnas," or "Regina" in front of plaintiff on several occasions and directly called plaintiff "Medea"). *Compare Kang*, 296 F.3d at 817 (finding that a Korean plaintiff suffered national origin harassment where the employer verbally and physically abused the plaintiff because of his race); *Nichols v. Azteca Rest. Enters.*, 256 F.3d 864, 872-73 (9th Cir.2001) (finding a hostile work environment where a male employee was called "faggot" and "fucking female whore" by co-workers and supervisors at least once a week and often several times per day); *Anderson v. Reno*, 190 F.3d 930 (9th Cir.1999) (finding a hostile work environment where a supervisor repeatedly referred to the employee as "office sex goddess," "sexy," and "the good little girl" and where he humiliated the employee in public by drawing a pair of breasts on an easel while the employee was making a presentation and then told the assembled group that "this is your training bra session," and where the employee received vulgar notes and was patted on the buttocks and told she was "putting on weight down there"), *abrogated on other grounds in Morgan*, 536 U.S. 101, 122 S. Ct. 2061, 153 L.Ed.2d 106; *Draper v. Coeur Rochester*, 147 F.3d 1104, 1109 (9th Cir.1998) (finding hostile work environment where plaintiff's supervisor made repeated sexual remarks to her, told her of his sexual fantasies and desire to have sex with her, commented on her physical characteristics, and asked over a loudspeaker if she needed help changing her clothes).

26  *Id.*

ORDER ON DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT - 16

## CONCLUSION

Mr. Darrah failed to establish a prima facie case of age discrimination.  Likewise, he failed to show that he was subjected to verbal or physical conduct because of his age or that the conduct was sufficiently severe or pervasive to alter the conditions of his employment and create an abusive working environment.  Accordingly,

**IT IS ORDERED** that:

1.  Defendant's Motion for Summary Judgment, filed December 27, 2011, **ECF No. 18**, is **GRANTED**.

2.  Plaintiff's claims are **DISMISSED WITH PREJUDICE**.

3.  Each party shall bear their own attorneys' fees and costs.

The District Court Executive is directed to:

• File this Order,

• Enter judgment in favor of the Defendant,

• Provide copies to counsel, and to

• Close this file

**DATED** this 22nd day of February, 2012.

s/ Wm. Fremming Nielsen
WM. FREMMING NIELSEN
SENIOR UNITED STATES DISTRICT JUDGE

02-21-12

ORDER ON DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT - 17